# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

February 24, 2022

To: Roger A. G. Sharpe
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis, IN 46204-0000

| No. 21-1276 | LAURA EWING,<br>   Plaintiff - Appellant<br><br>v.<br><br>MED-1 SOLUTIONS, LLC,<br>   Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:18-cv-01743-JRS-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge James R. Sweeney ||

| No. 21-1299 | SEPTEMBER WEBSTER,<br>   Plaintiff - Appellant<br><br>v.<br><br>RECEIVABLES PERFORMANCE MANAGEMENT, LLC,<br>   Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:18-cv-03940-TWP-DML<br>Southern District of Indiana, Indianapolis Division ||

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:      No record to be returned

form name: **c7_Mandate**   (form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

February 2, 2022

Before

DIANE S. SYKES, *Chief Judge*
DAVID F. HAMILTON, *Circuit Judge*
AMY J. ST. EVE, *Circuit Judge*

CERTIFIED COPY

| No. 21-1276 | LAURA EWING,<br>        Plaintiff - Appellant<br><br>v.<br><br>MED-1 SOLUTIONS, LLC,<br>        Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:18-cv-01743-JRS-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge James R. Sweeney ||

| No. 21-1299 | SEPTEMBER WEBSTER,<br>        Plaintiff - Appellant<br><br>v.<br><br>RECEIVABLES PERFORMANCE MANAGEMENT, LLC,<br>        Defendant - Appellee |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:18-cv-03940-TWP-DML<br>Southern District of Indiana, Indianapolis Division<br>Chief District Judge Tanya Walton Pratt ||

In *Ewing v. MED-1, LLC*, we **AFFIRM**, and in *Webster v. Receivables, LLC*, we **REVERSE AND REMAND**.

The above is in accordance with the decision of this court entered on this date. Each side to bear its own costs.

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 21-1276

LAURA EWING,

    *Plaintiff-Appellant*,

v.

MED-1 SOLUTIONS, LLC,

    *Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01743-JRS-DML — **James R. Sweeney II**, *Judge*.

No. 21-1299

SEPTEMBER WEBSTER,

    *Plaintiff-Appellant*,

v.

RECEIVABLES PERFORMANCE MANAGEMENT, LLC,

    *Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-03940-TWP-DML — **Tanya Walton Pratt**, *Chief Judge*.

Case 1:18-cv-03940-TWP-KMB Document 92 Filed 02/24/22 Page 4 of 18 PageID #: 1119
Case: 21-1276 Document: 00713961194 Filed: 02/24/2022 Pages: 16 (2 of 18)

2 Nos. 21-1276 & 21-1299

ARGUED DECEMBER 14, 2021 — DECIDED FEBRUARY 2, 2022

———————

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge.* Laura Ewing and September Webster disputed certain debts they allegedly owed to debt-collection companies. Under the Fair Debt Collection Practices Act ("FDCPA"), debt-collection companies must report such disputes to credit reporting agencies, *see* 15 U.S.C. § 1692e(8), but the companies here failed to do so. Ewing and Webster sued separately, seeking actual and statutory damages. *See id.* § 1692k(a). The companies prevailed at summary judgment because the district courts in both cases determined that the companies' mistakes were bona fide errors. *See id.* § 1692k(c).

On appeal, both Ewing and Webster argue that the debt collectors' actions were not bona fide errors. We have consolidated their cases for decision. Before we may reach the merits, though, we must reexamine the requirements for Article III standing, particularly in light of the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), which clarified what counts as an injury-in-fact.

## I. Background

### A. Ewing v. MED-1 Solutions, LLC

Laura Ewing sought to dispute medical debts by faxing a letter to MED-1 Solutions, LLC, a debt-collection company assigned to her case. MED-1's receptionist, however, misrouted the fax, forwarding it to the client-care department rather than the legal department. According to MED-1's fax-distribution policy, any faxed legal communication regarding

Nos. 21-1276 & 21-1299                                                3

contested debts was to be forwarded to the legal department. That day the receptionist received five additional dispute letters, which she correctly forwarded to the legal department. But as a result of the misrouted fax, Ewing's dispute was never recorded.

Two years later, Ewing obtained her credit report and saw that her debts, as reported by MED-1, were not indicated as disputed. After MED-1 eventually recorded the debts as disputed, her credit score rose.

Ewing sued MED-1 for violations of the FDCPA. She asserted that MED-1 reported her debts to a credit reporting agency without noting that the debts were disputed. *See* 15 U.S.C. § 1692e(8). MED-1 admitted that it had received Ewing's dispute letter and failed to report the dispute to the credit reporting agency, and it raised the affirmative defense of bona fide error under § 1692k(c). This provision provides safe harbor for debt collectors when they make an unintentional error, so long as they maintained procedures reasonably adapted to avoid it. MED-1 argued that the bona fide error defense applied because its failure to report the dispute arose from an unintentional error and it maintained procedures reasonably adapted to ensure that it reported faxed disputes. After discovery both parties moved for summary judgment, and the district judge entered summary judgment for MED-1 based on its affirmative defense.

**B. Webster v. Receivables Performance Management, LLC**

September Webster discovered that her credit report reflected a debt that she did not believe she owed. She sought to dispute that debt, so her attorney faxed a dispute notice to the debt collector, Receivables Performance Management,

4                                                            Nos. 21-1276 & 21-1299

LLC. The attorney faxed the notice after verifying that Receivables's fax number—one he had used on behalf of other clients—remained listed with the Nationwide Multistate Licensing System & Registry, the entity responsible for licensing debt collectors in Indiana. He received a confirmation that the fax was sent successfully.

Unbeknownst to Webster's attorney, Receivables had decided several months earlier—without announcement—to stop monitoring its electronic fax inbox. It stopped checking its inbox after removing from its website the fax number Receivables had used to communicate about disputes with debtors and their attorneys. Receivables had general policies for handling known disputes but no procedure in place to check its fax inbox periodically for new disputes or to notify senders that the inbox was unmonitored. As a result, Receivables was unaware that Webster had faxed any dispute. Because Receivables did not disconnect or disable the fax number, however, the line sent confirmations upon receipt of faxes, including those sent by Webster's attorney.

Webster sued after she obtained an updated credit report that reflected her DirecTV debt but not her dispute. She alleged that Receivables's failure to communicate her dispute harmed her credit reputation and credit score. She submitted evidence that her credit score rose once her credit report reflected her other disputed debts. Receivables countered that even if it had violated the FDCPA, its violation was excused by the bona fide error defense. *See id.* § 1692k(c). Both parties moved for summary judgment and the district judge granted Receivables's motion based on her assessment that Receivables violated the statute, but its error was bona fide.

Nos. 21-1276 & 21-1299 5

## II. Discussion

In these appeals, the Debt Collectors[1] raise a threshold standing argument. They assert that under *TransUnion*, which was decided while these appeals were pending, the Consumers lack standing because any risk of future harm they face is not sufficiently concrete to support a suit for damages. And without a concrete injury, there is no case or controversy for us to adjudicate. *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

### A. Standing

We begin with a few words about the law of standing. Article III standing requires the party invoking federal jurisdiction to demonstrate that (1) the plaintiff has suffered an injury-in-fact, (2) the injury was caused by the defendant, and (3) the injury is redressable by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact must be concrete, particularized, and actual or imminent. *Id.* A concrete injury is essential to standing: "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200.

To be concrete, an injury must be "'real,' and not 'abstract,'" but concrete need not mean tangible. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). Traditional tangible harms, such as physical or monetary harm, easily meet the concreteness requirement. *TransUnion*, 141 S. Ct. at 2204. Intangible harms can be more difficult to assess. Intangible harms are concrete if the plaintiff's alleged injury bears a "close relationship" to the sort of harms traditionally

---

[1] In nearly all respects, the parties raise materially identical arguments. So, for convenience, we refer to them collectively as the Debt Collectors (MED-1 and Receivables) and Consumers (Ewing and Webster). We will differentiate between the parties when necessary.

Case 1:18-cv-03940-TWP-KMB  Document 92  Filed 02/24/22  Page 8 of 18 PageID #: 1123
Case: 21-1276  Document: 00713961134  Filed: 02/24/2022  Pages: 16  (6 of 18)

6                                         Nos. 21-1276 & 21-1299

recognized by American courts, such as reputational harm. *Spokeo*, 578 U.S. at 341. The close-relationship inquiry looks for "a close historical or common-law analogue" to the alleged injury but does not require an "exact duplicate." *TransUnion*, 141 S. Ct. at 2204. When determining if a statutorily identified, intangible harm has a close-but-not-exact match in American history or at common law, we look to the kind of injury the statute protects, not the degree of harm suffered. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020).

When considering intangible harm, we start from a place of respect for Congress's prerogative to create statutory rights and obligations. *TransUnion*, 141 S. Ct. at 2204. But Congress may not make up injuries and decree them to be actionable. *Id.* at 2205. Thus, while Congress may elevate *de facto* injuries that once were thought to be insufficiently injurious to form the basis of a federal lawsuit, such an injury must still cause real-world harm in order to confer standing. *Id.* at 2204–05. In this context, then, Congressional authorization to sue is a necessary, but not sufficient, condition because one still must be "*concretely harmed* by a defendant's statutory violation." *Id.* at 2205 (emphasis in original).

Concrete harms are sometimes difficult to identify, especially when the harm is intangible. For example, in *Spokeo* the Court indicated that, for standing purposes, a material risk of harm could be concrete. *Spokeo*, 578 U.S. at 341–42. The Court wrote that, although procedural violations do not automatically create concrete injuries, "[t]his does not mean … that the risk of real harm cannot satisfy the requirement of concreteness." *Id.* at 341 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).

Nos. 21-1276 & 21-1299 7

The Court's recent decision in *TransUnion* clarified that a risk of future harm is concrete only if the suit is for injunctive relief. *See TransUnion*, 141 S. Ct. at 2210. The plaintiffs in *TransUnion* were a class of individuals whose credit reports contained a false notice that the individual was considered a potential threat to national security. *Id.* at 2201–02. They sued TransUnion under the Fair Credit Reporting Act ("FCRA"), alleging violations of three of the FCRA's provisions. *Id.* at 2200–01; *see* 15 U.S.C. §§ 1681e(b), 1681g(a)(1), (c)(2).

The Court divided the plaintiff class into two subgroups based on whether the individual's credit report (with the misleading alert) had been disseminated to third parties. *TransUnion*, 141 S. Ct. at 2208–13. It then examined whether each subgroup had suffered an injury that bore a close relationship to a traditionally recognized harm. *Id.* The Court held that the plaintiffs whose credit reports had been disseminated had standing because the harm caused by the dissemination of a credit report with misleading information related closely to the reputational harm associated with defamation. *Id.*

On the other hand, the plaintiffs whose credit reports had not been disseminated lacked standing. *Id.* at 2209–13. The Court rejected these plaintiffs' analogy to defamation because they could not prove dissemination, which, in this context, was essential to liability. *Id.* at 2209. Without any disclosure to a third party, these plaintiffs could not recover on a close-relationship-to-defamation theory because the mere existence of inaccurate information did not concretely injure them. *Id.*

Nor was the risk of that information being exposed in the future a concrete injury. *Id.* at 2211. The plaintiffs relied on *Spokeo* for the proposition that a material risk of harm can

Case 1:18-cv-03940-TWP-KMB Document 92 Filed 02/24/22 Page 10 of 18 PageID #: 1125
Case: 21-1276 Document: 00713961134 Filed: 02/24/2022 Pages: 16 (8 of 18)

8                  Nos. 21-1276 & 21-1299

satisfy the concrete-harm requirement; the Court, however, distinguished *Spokeo* on the ground that *Spokeo* cited *Clapper*, which was a suit for injunctive relief. *Id.* at 2210. And "a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages." *Id.*

Our pre-*TransUnion* case law was shaped by *Spokeo*'s understanding of concreteness. In *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337 (7th Cir. 2018), for instance, we focused on the risk of financial harm posed to a consumer by an erroneously low credit score. *Id.* at 344–46. There, as in the present appeals, a debt collector failed to report several consumers' disputes of debts that it sought to collect. *Id.* at 342–43. The consumers alleged that this omission violated their procedural rights under 15 U.S.C. § 1692e(8) and created a risk of real harm that was a sufficiently concrete injury under *Spokeo*. *Id.* at 344–45. We agreed and held that the consumers had standing because they alleged a risk of concrete financial harm caused by an inaccurately low credit score. *Evans*, 889 F.3d at 346.

*TransUnion* alters our understanding of *Spokeo* and supersedes *Evans* to the extent *Evans* says that a mere risk of harm is a sufficiently concrete injury to support a suit for damages. *TransUnion* makes clear that a risk of future harm, without more, is insufficiently concrete to permit standing to sue for damages in federal court. *See TransUnion*, 141 S. Ct. at 2212–13; *cf. Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1193 n.3 (10th Cir.

Case 1:18-cv-03940-TWP-KMB Document 92 Filed 02/24/22 Page 11 of 18 PageID #: 1126
Case: 21-1276 Document: 00713961134 Filed: 02/24/2022 Pages: 16 (9 of 18)

Nos. 21-1276 & 21-1299 9

2021); *Ward v. Nat'l Patient Account Servs. Sols., Inc.*, 9 F.4th 357, 361 (6th Cir. 2021).[2]

In the wake of *TransUnion*, then, we ask whether the Consumers suffered a concrete injury when the Debt Collectors communicated false information (i.e., reports of debts not being disputed) about them to a credit-reporting agency. The Consumers maintain that their injury is concrete because the dissemination of false information to a credit reporting agency bears a close relationship to reputational harms long recognized in American courts and at common law, such as defamation.

The Debt Collectors argue that the Consumers could not have suffered a concrete injury because there is no evidence that TransUnion sent the Consumers' credit reports to potential creditors. According to the Debt Collectors, this means the Consumers are in the same position as the losing subclass in *TransUnion*. *See TransUnion*, 141 S. Ct. at 2209. But the argument is a red herring. If the Consumers' harm is analogous to defamation, then they must demonstrate that the Debt Collectors disseminated false information about them to a third party. The Consumers do not have to make a further showing that the third party *also* shared that false information.

These appeals also differ from *TransUnion* in a significant regard—different statutes are implicated and the subjects whom the applicable statutes aim to regulate are different. *TransUnion* applied the FCRA, which seeks to regulate the

---

[2] Nevertheless, the outcome of *Evans* would be the same under this decision for the injury the plaintiffs in *Evans* suffered is indistinguishable from the injury the Consumers suffered.

Case 1:18-cv-03940-TWP-KMB Document 92 Filed 02/24/22 Page 12 of 18 PageID #: 1127
Case: 21-1276 Document: 00713961134 Filed: 02/24/2022 Pages: 16 (10 of 18)

10            Nos. 21-1276 & 21-1299

procedures used by credit reporting agencies. 15 U.S.C. § 1681(b). The FDCPA, by contrast, aims to prevent abuses committed by debt collectors. *See id.* § 1692(e). Under the FDCPA, a consumer must show that a debt collector reported false information, such as by failing to communicate the disputed nature of a debt. The Debt Collectors' comparison between the Consumers here and the losing subclass in *TransUnion* would have us hold that the Consumers must show fourth-party publication, which *TransUnion* does not require.

Instead, *TransUnion* requires us to ask whether the injury protected by § 1692e(8) bears a close relationship to a harm traditionally recognized in American history or at common law. *See TransUnion*, 141 S. Ct. at 2208–09. The statutory violation in these cases is clear—the Debt Collectors failed to report a dispute that they should have known about. And Congress specifically authorized the Consumers' claims for redress. 15 U.S.C. § 1692e(8). Congress created that claim, along with other enumerated claims, to counter abusive debt-collection practices and to ensure that upstanding debt collectors are not at a competitive disadvantage. *Id.* § 1692(e). But as we noted earlier, a statutory violation alone does not make an injury concrete. So, we must look for a common law analogue to ensure a concrete harm. *See TransUnion*, 141 S. Ct. at 2204–05.

We believe the harm Congress sought to remedy through § 1692e(8) is analogous to the harm caused by defamation, which has long common law roots. Following the Court's example in *TransUnion*, we consider the reputational harm that occurs when one publishes a false and defamatory communication about another. *See TransUnion*, 141 S. Ct. at 2209–10; Rest. (Second) of Torts § 558.

In assessing the Consumers' injury, we focus on the question of publication because an unpublished statement, even if false and defamatory, is not injurious. *TransUnion*, 141 S. Ct. at 2209–10. Specifically, we pause to consider whether the Debt Collectors' communications to TransUnion count as publication in light of some dicta in *TransUnion*. In footnote six, the Court acknowledged that the subclass of plaintiffs whose credit reports were not disseminated raised a forfeited argument that TransUnion had "published" their personal and financial information to its own employees and to its printing vendors. *Id.* at 2210 n.6. The Court observed that American courts had not "necessarily recognized disclosures to printing vendors as actionable publications" and implied that, under such circumstances, a plaintiff would need to present evidence that the defendant had "brought an idea to the perception of another." *Id.*

The Consumers have shown publication here through their evidence of third-party dissemination. In this regard, they resemble the prevailing subclass in *TransUnion*, who demonstrated that misleading information about them had been "disseminated to third parties" and so "suffered a concrete injury in fact under Article III." *Id.* at 2209. The Court in *TransUnion* did not require those plaintiffs to come forward with additional evidence of publication because dissemination was clear. *See id.* at 2209. Here too the Debt Collectors disseminated false reports about the Consumers to TransUnion. To require more of the Consumers would permit the dicta in footnote six to erode *TransUnion*'s holding that evidence of dissemination to a third party is sufficient to show publication.

12                                         Nos. 21-1276 & 21-1299

Because the Consumers demonstrated third-party dissemination, their appeals do not implicate the Court's reference to a general requirement that defamatory content is read, not merely processed. *See id.* 2210 n.6. In footnote six, the Court pointed to a line of cases that dealt with liability for dictating defamatory matter to a stenographer. *Id.* (citing *Ostrowe v. Lee*, 175 N.E. 505 (N.Y. 1931)). These cases were concerned with whether the stenographer was simply mechanically transmitting the words or whether she perceived or understood the defamatory significance of what was dictated. *See Ostrowe*, 175 N.E. at 505 (publication occurs when defamatory content is "read and understood"). Reading was a proxy for understanding rather than just mechanically transmitting information, but was not always required. *See* Rest. (Second) of Torts § 577 cmt. h; *see also Rickbeil v. Grafton Deaconess Hosp.*, 23 N.W.2d 247, 252–56 (N.D. 1946) (collecting cases). The essential point, one that has always been necessary to prove publication, is this: the third party must understand the defamatory nature of the communication. *See* Rest. (Second) of Torts § 577 cmt. c.

To determine whether there has been a publication here, then, we ask whether TransUnion understood the defamatory significance of the Debt Collectors' reports. We believe that it did. TransUnion included the debts in the Consumers' credit reports; TransUnion would have included the disputes too had the Debt Collectors communicated them. And the Consumers submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not. That is enough to show that TransUnion understood the significance of the reports.

Case 1:18-cv-03940-TWP-KMB Document 92 Filed 02/24/22 Page 15 of 18 PageID #: 1130
Case: 21-1276 Document: 00713961194 Filed: 02/24/2022 Pages: 16 (13 of 18)

Nos. 21-1276 & 21-1299 13

The Consumers suffered an intangible, reputational injury that is sufficiently concrete for purposes of Article III standing. Specifically, they have shown that their injury is related closely to the harm caused by defamation. Reputational harm of this sort is a real-world injury; being portrayed as a deadbeat who does not pay her debts has real-world consequences.

### B. The Bona Fide Error Defense

We proceed to the merits, and specifically the conclusions of both district courts applying the bona fide error defense. The district judge in Ewing's case concluded that, regardless of whether MED-1's actions violated the FDCPA, its mistake was a bona fide error that shielded it from liability. *See* 15 U.S.C. § 1692k(c). The judge in Webster's case determined that Receivables's actions violated the FDCPA but excused that violation as a bona fide error. *See id.* We review those decisions de novo with all facts and reasonable inferences drawn in favor of the non-prevailing parties, here the Consumers. *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a)).

Under the bona-fide-error defense, a debt collector is not liable for violating the FDCPA if it shows by a preponderance of the evidence that (1) the violation was not intentional, (2) the violation resulted from a bona fide error, and (3) it maintained procedures reasonably adapted to avoid the error. *Abdollahzadeh v. Mandarich L. Grp., LLP*, 922 F.3d 810, 815 (7th Cir. 2019) (citing *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005)).

The Consumers essentially argue that the Debt Collectors failed to satisfy the third element—that they maintained

14                      Nos. 21-1276 & 21-1299

reasonable procedures to avoid the error.[3] The Supreme Court has defined "reasonably adapted" procedures "to avoid any such error" to mean "mechanical or other such 'regular orderly' steps to avoid mistakes." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010). Such steps do not require that a debt collector take "every conceivable precaution to avoid errors," only reasonable ones. *Kort*, 394 F.3d at 539. This inquiry is fact intensive and "susceptible of few broad, generally applicable rules of law." *Abdollahzadeh*, 922 F.3d at 817. *Compare id.* at 817–18 (debt collector's "unquestionably simple" procedures reasonably adapted to avoid the error of attempting to collect time-barred debts), *with Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 900 (7th Cir. 2015) (debt collector's "thinly specified 'policy,'" not reasonably adapted to avoid sending improper collection letters).

    Juxtaposing the facts of these two appeals illuminates the meaning of "reasonably adapted" procedures. In Ewing's case, MED-1's receptionist accidentally forwarded Ewing's faxed dispute letter to the wrong department. Given the steps that MED-1 had in place to prevent this sort of mistake, the judge was correct to conclude that MED-1 had reasonably adapted procedures. The judge looked to MED-1's two written policies that explained, step-by-step, how a receptionist should properly direct legal faxes. And the judge

---

[3] Webster alone argues that the judge erred with regard to the first element when she concluded that Receivables's violation was unintentional. In her view, Receivables's decision to stop monitoring its fax inbox was intentional. But Receivables needed to show only that its FDCPA *violation* was unintentional, not that its *actions* were unintentional. *Abdollahzadeh*, 922 F.3d at 815. The judge thus rightly concluded that Receivables met the first element.

appropriately found that these were the kind of "mechanical [] steps" that the defense requires. Though a mistake still occurred, an errant misdirected fax is just the kind of "occasional unintentional misstep" to which the bona fide error defense applies. *Abdollahzadeh*, 922 F.3d at 817. Ewing argues that MED-1 needed to have a policy requiring departments to identify and forward misdirected faxes. The absence of such a policy, however, does not mean that MED-1 failed to maintain reasonably adapted procedures. If MED-1's step-by-step fax procedures had been followed, then the error that gave rise to this case would have been avoided. We see no reason to disturb the district court's conclusion that those procedures were reasonably adapted to prevent it.

In Webster's case, however, we disagree with the judge's finding that Receivables had reasonable procedures in place to prevent its error. Even though its fax number was still listed by a national registry, Receivables decided to stop checking its electronic fax inbox, without any announcement. And when Webster faxed her dispute letter, she received an electronic confirmation that her letter had been received. It was not reasonable for Receivables to stop monitoring its fax inbox while allowing the system to continue sending confirmations that faxes had been received. Unwitting consumers such as Webster had no reason to know better.

The judge, however, glossed over that specific issue. The judge asked broadly "whether [Receivables] ha[d] procedures in place to avoid incorrectly reporting debts that were disputed." Noting Receivables's general policies that "designat[ed] how to handle disputed debts" and its practice of "updating its employees annually on procedure," the judge concluded that Receivables had implemented procedures that

16                                                           Nos. 21-1276 & 21-1299

were sufficiently adapted to avoid the possibility of faxed disputes going unreported. But these procedures do not account for the likely prospect that debtors would continue faxing disputes (at least until they had reason to know better) that Receivables would not report. Receivables needed to have procedures to address the actual *error* that occurred. *See Kort*, 394 F.3d at 537–38 (the bona fide error was narrower than, and led to, the FDCPA violation). Like the debt collector in *Leeb* whose "thinly specified 'policy'" was inadequate because it did not address the error that occurred, *see Leeb*, 806 F.3d at 900, Receivables's unspecified FDCPA training for employees and general policy of reporting disputes does not suffice. For regardless of these imprecise policies, Receivables had no reasonable procedure in place to ensure that *faxed* disputes were reported. Nor did Receivables implement any reasonable procedure to ensure that it would no longer receive faxed disputes in the first place.

Unlike MED-1's one-time misstep in *Ewing*, Receivables's lack of procedures invited the error that occurred in this case. Until debtors and their attorneys knew that Receivables no longer accepted disputes by fax, it was entirely foreseeable that Receivables would continue receiving faxed disputes. Receivables used no procedures to avoid the error that occurred, let alone reasonable ones, and so is not sheltered by the bona fide error defense.

### III. Conclusion

For the foregoing reasons, in *Ewing v. MED-1, LLC*, we AFFIRM, and in *Webster v. Receivables, LLC*, we REVERSE AND REMAND.



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit